This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------

No. 60
The People &c.,
            Respondent,
        v.
Miguel Viruet,
            Appellant.

            Leila Hull, for appellant.
            Nancy Fitzpatrick Talcott, for respondent.

GARCIA, J.:

        Shortly after a fatal shooting took place, a law enforcement agent collected video surveillance footage of the crime scene but that evidence was lost prior to trial.  We now consider whether, as a result, defendant was entitled to an adverse inference jury instruction. We hold that, under the circumstances, the trial court erred in failing to provide such an instruction, but that this error was harmless.  For that

- 1 -

reason, we affirm.

Defendant was charged with, among other things, intentional murder in the second degree and two counts of criminal possession of a weapon in the second degree in connection with a late-night shooting outside a Queens nightclub. Earlier on the evening of the shooting, defendant's brother, Stephen, was struck by an unknown assailant outside of the club. When the club's bouncer was unable to identify the assailant, Stephen called defendant and asked him to come to the club. According to the bouncer, a short time later defendant pulled up to the front of the club in a dark colored Honda, got out, and immediately confronted him, demanding to know who hit his brother. Several people from inside the club surrounded defendant prompting him to drive off. As defendant drove away, however, he warned that he was "coming back." Approximately 10 to 15 minutes later, someone near the club yelled "they're back."  At that moment, the victim, the bouncer, and another witness, were standing by the front entrance of the club when an individual across the street fired nine shots in their direction. The 19-year-old victim, who was trying to get through the door into the club, was shot and died a short time later.

The club's bouncer identified defendant in a photo array hours after the shooting and in a lineup following defendant's arrest approximately two months later. He testified at trial that although he did not see the shooter's face

completely, he "could tell by what [the shooter] was wearing and the way he looked that it was the same person that was driving the [Honda]." However, he admitted on cross-examination that despite his prior identifications, he could not say for sure whether defendant was the shooter by looking at his face because he "didn't see across the street." The other witness, in identifying defendant, testified that he had a "good view" of defendant at the time of the shooting, could see where the bullets were coming from, and was able to observe defendant's face. Although the witness did not know defendant, he knew defendant's brother "from around the way," and had seen him on 2 or 3 prior occasions.[1]

The People also called one of defendant's childhood friends who had been arrested approximately two months after the shooting on an unrelated gun charge. Pursuant to a plea deal, the witness agreed to testify for the prosecution at defendant's trial. According to his detailed testimony, the day after the shooting, defendant confessed that he and his brother were involved in an altercation at the club and that defendant had fired his weapon "in th[e] direction" of someone who was yelling at him.

Prior to trial, defendant timely requested disclosure of the club's surveillance footage from the night of the murder

---

[1] Nothing in the record equates, as the dissent contends, to a concession by the witnesses that "defendant and his brother could be mistaken for one another" (dissenting op at 7).

and the District Attorney's office requested the same from the police department. The arresting officer, Detective Ragab, who just hours after the shooting viewed and obtained a copy of the video taken from a camera located outside the club's front door, could not locate the video. Detective Ragab explained that he did not voucher the video pursuant to police department policy because he "just did not get to it." Though he attempted to obtain another copy, the club had shut down and he could not locate the owner.

Several witnesses nevertheless provided some information about the lost video. One witness testified that the club had a "pretty good surveillance system" with a camera located by the awning above the door showing the front of the bar. Detective Ragab testified that he watched the video and could see people going in and out of the club during the course of the evening as well as people running inside at the time of the shooting. He claimed the area covered by the camera "barely leaves the sidewalk" but acknowledged that there was no way without the video to determine how far out the coverage extended. The bouncer -- who had also watched the video -- testified that the footage captured the victim, the other trial witness, and him at the front door as the shots were fired. He also testified that the camera did not face in the direction of the location where he saw defendant firing his weapon. There was no testimony regarding whether the earlier confrontations with the bouncer were captured

on the surveillance footage.

At a pre-charge conference, defense counsel requested an adverse inference charge based on the missing video, arguing that there was evidence the video might have captured the events of the night and that without it, it was impossible to determine precisely what was on it, and that the jury should be informed that they could assume it was beneficial to defendant. The court denied the request for the charge, stating that it would only be appropriate if the evidence, had it been produced, would have been favorable to defendant. The court explained that the charge was not warranted because there was no testimony that the video would have shed light on the identity of the shooter. The jury convicted defendant of intentional murder and both gun possession counts.

The Appellate Division unanimously affirmed, holding that the lower court "properly declined to give an adverse inference charge" because "there was no evidence that the video camera recorded anything relevant to the case, and the evidence suggested otherwise" (People v Viruet, 131 AD3d 714, 715 [2d Dept 2015]). A Judge of this Court granted leave to appeal (26 NY3d 1093 [2015]) and, for the reasons discussed below, we now affirm.

Defendant relies on our decision in People v Handy, pointing to our holding that "when a defendant in a criminal case, acting with due diligence, demands evidence that is reasonably likely to be of material importance, and that evidence

has been destroyed by the State, the defendant is entitled to an adverse inference charge" (20 NY3d 663, 665 [2013]). In such circumstances, the charge is no longer "discretionary," but is "mandatory upon request" (People v Blake, 24 NY3d 78, 82 [2014]). We agree that the rule in Handy applies here and that failure to give the instruction was error.

Initially, we reject the People's argument that the video was not discoverable because they did not intend to use it at trial. Given that there is no indication that the prosecutors had the opportunity to view the video prior to its request to the police to locate it in the file, it is difficult to credit the argument that, without ever having seen it, they never intended to use it. Moreover, such a ruling would undermine the incentive for the State to preserve evidence, as it would provide the People with the opportunity to avoid issues of lost evidence by simply claiming they had no intent to use it (see Handy, 20 NY3d at 669). Likewise, we reject the People's argument that they were not required to preserve the video because, unlike the prison video in Handy, it was created by a third party. Once the police collected the video, the People had an obligation to preserve it (see People v Kelly, 62 NY2d 516, 520 [1984]; CPL 240.20 [1] [g]).

Under these circumstances -- where defendant acted with due diligence by requesting the evidence in discovery and the lost evidence was video footage of the murder defendant was

charged with committing -- it cannot be said that the evidence
was not "reasonably likely to be of material importance" (<u>Handy</u>,
20 NY3d at 665). According to the trial testimony, the camera
captured the moment when the victim was shot and the location of
the two eyewitnesses at the time of the shooting. There was also
testimony that the video contained footage of people going in and
out of the club throughout the course of the night, making it at
least possible that the video captured the earlier incident
involving defendant and the bouncer -- a key issue in the
sequence of events. Contrary to the determination of the
Appellate Division, a video of the shooting and of the
eyewitnesses at or around the time of the murder is certainly
"relevant to the case" (<u>Viruet</u>, 131 AD3d at 715) and is
sufficient to satisfy the standard set out in <u>Handy</u>. Moreover, as
in <u>Handy</u>, testimony concerning what appeared on the video came in
large part from a witness whose own actions "created the need to
speculate about its contents" (<u>Handy</u>, 20 NY3d at 669).
Accordingly, the trial court erred in failing to give an adverse
inference instruction.

However, given the strength of the People's case, the
error was harmless. "Errors of law of nonconstitutional magnitude
may be found harmless where 'the proof of the defendant's guilt,
without reference to the error, is overwhelming' and where there
is no 'significant probability . . . that the jury would have
acquitted the defendant had it not been for the error'" (<u>People v</u>

Byer, 21 NY3d 887, 889 [2013], quoting People v Crimmins, 36 NY2d 230, 242 [1975]).

In addition to the eyewitness accounts described above, the People presented testimony that defendant confessed to the shooting. That witness's account was consistent with the version of the relevant events provided by the witnesses to the shooting. Additionally, the shooting occurred less than 20 minutes after an earlier altercation at the club ended with defendant threatening to return and immediately after someone nearby yelled "they're back." In light of this proof, such a permissive adverse inference instruction to the jurors that they might have but were not required to infer that the lost video would have been favorable to the defense would not have created a "significant probability . . . that the jury would have acquitted [] defendant" (Crimmins, 36 NY2d at 241-242).

Accordingly, the order of the Appellate Division should be affirmed.

People v Miguel Viruet

No. 60

WILSON, J.(dissenting):

I fully concur in the majority's excellent exposition of why the trial court erred in failing to provide an adverse inference jury instruction. However, I cannot agree that the error was harmless. I therefore would reverse and remit for a new trial.

As explained by the majority, defendant diligently requested from the People a copy of the nightclub's video footage, which was "reasonably likely to be of material importance" (People v Handy, 20 NY3d 663, 665 [2013]). Defendant was, therefore, entitled to an adverse inference charge, and the charge was "mandatory upon request" (People v Blake, 24 NY3d 78, 82 [2014]). As the majority holds, defendant should have received the requested charge, and the trial court's failure to do so amounted to error.[1]

_____

    [1]  Further, the fact that the trial court allowed defense counsel on cross examination and later on summation to argue about the absence of the videotape was not an adequate remedy for the court's failure to give the adverse inference charge. "[A] trial counsel's appeal to the jury during summation is not ordinarily a substitute for the appropriate jury charge by the court" (DeVito v Feliciano, 22 NY3d 159, 167 [2013]). Indeed, jurors are routinely admonished that "arguments of counsel made

- 1 -

I do not agree with the majority, however, that the error was harmless.  In situations where evidence of guilt is overwhelming, "an error is prejudicial [to the defendant] . . . if the appellate court concludes that there is a significant probability, rather than only a rational possibility, in the particular case that the jury would have acquitted the defendant had it not been for the error or errors which occurred" (People v Crimmins, 36 NY2d 230, 242 [1975]).  However, "unless the proof of the defendant's guilt, without reference to the error, is overwhelming, there is no occasion for consideration of any doctrine of harmless error" (id. at 241).  "'[O]verwhelming proof of guilt' cannot be defined with mathematical precision" and "does not invite merely a numerical comparison of witnesses or of pages of testimony" (id.).  Instead, "the nature and the inherent probative worth of the evidence must be appraised.  As with the standard, 'beyond a reasonable doubt', the recourse must ultimately be to a level of convincement" (id.).  Thus, to be

during the course of trial are not evidence and must not be considered by you as such" (1 CJI2d[NY] Arguments of Counsel, § 5.13), whereas the court "is responsible for explaining the law, not the lawyers . . . . [Y]our sworn duty as jurors is to follow [the court's] instructions on the law" (NY Criminal Jury Instructions & Model Colloquies, Model Instructions, Final Instructions: Pre-Summation Instructions, at i-iii, available at http://www.nycourts.gov/judges/cji/5-SampleCharges/CJI2d.Final_In structions.pdf [accessed May 18, 2017]; see e.g. People v Williams, 29 NY3d 84 [2017]; United States v Kennedy, 234 F3d 1263 [2d Cir 2000]).  Thus, we have long recognized that "'[t]he court's charge is of supreme importance to the accused'" (People v Owens, 69 NY2d 585, 589 [1987], quoting People v Odell, 230 NY 481, 487 [1921]).

overwhelming, "the quantum and nature of proof, excising the error, [must be] so logically compelling and therefore forceful in the particular case as to lead the appellate court to the conclusion that a jury composed of honest, well-intentioned, and reasonable men and women on consideration of such evidence would almost certainly have convicted the defendant" (id. at 241-242 [internal quotation marks omitted]).  Here, the majority's recitation of the facts paints an incomplete picture, and effectively substitutes this Court for the trier of fact. Although the evidence would support a jury verdict of guilt, it was not overwhelming.

Much of the People's proof came from two eyewitnesses -- Xavier White, a patron at the nightclub where the shooting took place, and David Herbert, the club's bouncer -- who both testified that they had viewed the gunman only for a few seconds, at most.  Defendant was a stranger to both of them.  The shooting occurred at nighttime, and the shooter was across the street from the entrance to the bar.  Mr. White asserted that, when the gunshots began, he was facing the front of the bar, turned around, saw the shooter for "split seconds," and then ran back inside the bar.  Notably, Mr. Herbert admitted, on cross examination, that he could not know for sure who the shooter was because he "did not see his face completely" and "didn't see across the street."

Messrs. White and Herbert based their identification of

the gunman on their interactions with defendant earlier that evening.  However, according to their testimony, neither witness had seen defendant prior to that night and both witnesses had only fleeting encounters with defendant earlier in the evening. Further, both witnesses acknowledged that defendant and his brother, Stephen, who had a verbal altercation with Mr. Herbert earlier that evening, looked very much alike.  Mr. White testified that defendant and Stephen "looked like twins" and "[t]he only difference [between them] was one being taller and the other being shorter."  Mr. Herbert, when presented with two photo arrays the morning after the shooting, identified defendant as the shooter from one array, but identified a different brother of defendant's, who was in prison at the time of the shooting, as the individual involved in the earlier altercation from the other array.  From the testimony of the two eyewitnesses, a fair conclusion would be that someone with a familiar resemblance to defendant was the shooter, but both eyewitness demonstrated an inability to distinguish one brother from the other(s).

Those eyewitnesses also offered inconsistent testimony as to the events leading up to the shooting, and provided different descriptions of what defendant wore and the car he drove that night.  Mr. Herbert testified that defendant arrived with two other people in a "dark black" or "dark blue" Honda, whereas Mr. White testified that only defendant and a woman

exited a "dark green" Honda; he believed no one else was in the car.  Mr. White testified that defendant had on a dark blue shirt with a navy stripe, but could not recall if it was a polo or button-down shirt.  Mr. Herbert, on the other hand, described defendant as wearing a "blue sweater."  Mr. Herbert stated that he had a conversation with defendant that lasted "probably [a] couple of seconds" and then defendant went to speak with his brother Stephen, who was across the street.  According to Mr. Herbert, after defendant came back over to the nightclub, a crowd began to form as he and defendant argued, and then defendant left.  Mr. White testified differently: that defendant said he would return.

Robert Garcia, who was with defendant the night of the shooting, also testified at the trial.  Robert Garcia stated that he, defendant, and defendant's girlfriend had been at another club earlier that night.  He said that defendant had been frisked prior to entering that club and, upon leaving, police officers stopped him and defendant at a check point around the corner; the officers checked the car and let them proceed.  He further testified that he, defendant, and defendant's girlfriend all arrived at the nightclub in defendant's car, they stayed there "less than five minutes" in total, and then left with Stephen and Stephen's friend.  Robert Garcia stated that defendant dropped off Stephen and Stephen's friend approximately three blocks from the nightclub, and then defendant dropped Robert Garcia off

approximately ten blocks from there.

The People also called a cooperating witness, Jesse Garcia, a childhood friend of defendant, who testified that defendant had confessed to returning to the club and shooting a gun. However, Jesse Garcia admitted that, although he met with the police more than once prior to his arrest for an unrelated crime, he did not mention defendant's confession. Only after Jesse Garcia's arrest did he disclose defendant's purported confession, and he then obtained a reduced sentence in exchange for his cooperation.[2] Jesse Garcia's teary, choking delivery of his testimony against defendant, though consistent with truthfully providing testimony to send his friend to prison, is equally consistent with the guilt accompanying false testimony against his friend offered to reduce his own prison time. Jesse Garcia conceded that he did not know whether defendant actually committed the crime, and further testified that Stephen and defendant looked alike, so it was possible that they could be mistaken for one another at a distance.

Given the standard of proof beyond a reasonable doubt, the totality of the evidence in this case would support a verdict of either guilt or innocence. The evidence established that defendant and his look-alike brother were in the vicinity of the crime; defendant had just been searched at a different club and

---

[2] Although he was facing 5½ to 15 years in prison, Jesse Garcia pleaded guilty in exchange for a reduced prison sentence of 1½ to 3 years.

then by the police, who found no weapon; and defendant's brother had more of an altercation at the club than did defendant. The majority cites the eyewitness accounts and defendant's statements made to Jesse Garcia in support of its conclusion that the evidence in this case was overwhelming (see majority op at 7-8). However, "mistaken eyewitness identifications play a significant role in many wrongful convictions" (People v Santiago, 17 NY3d 661, 669 [2011]; see also People v Marshall, 26 NY3d 495, 502 [2015] ["Wrongful convictions based on mistaken eyewitness identification pose a serious danger to defendants and the integrity of our justice system"]). Here, the eyewitnesses essentially conceded that defendant and his brother could be mistaken for one another. Further, neither could conclusively say that defendant actually committed the crime -- Mr. Herbert did not see the shooter's face, and Mr. White, who testified that he saw the gunman's face in the dark from across the street, did so for only "split seconds" before running away into the bar under stressful and chaotic circumstances including gunfire. As to Jesse Garcia, he raised his account of defendant's confession with the police only after he had been arrested and was facing up to 15 years in prison. A jury could plausibly credit or discredit any of this testimony.

That the shooting occurred 20 minutes after defendant and his brother had left the nightclub lends just as much support, if not more, to the defense's theory that someone else

committed the shooting -- namely, Stephen.  Defendant dropped off Stephen and Stephen's friend only three blocks from the nightclub and then drove 10 more blocks to drop off Robert.  Additionally, just prior to the shooting, someone yelled "they're back" -- not "he's back."  Thus, it is just as plausible that Stephen and his friend -- who were just a few blocks away -- returned to the nightclub, and not defendant.

Where, as here, evidence, even if substantial, is not overwhelming, that ends the harmless error inquiry, and defendant is entitled to a new trial.  To act otherwise is to usurp the jury's role as trier of fact.  The question is not whether we think that giving the requested instruction would have changed the outcome: that question is for the jury to determine on retrial, weighing it along with the evidence and other instructions.  I therefore respectfully dissent.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order affirmed.  Opinion by Judge Garcia.  Chief Judge DiFiore and Judges Rivera and Fahey concur.  Judge Wilson dissents in an opinion in which Judge Stein concurs.

Decided June 6, 2017