Wilson, J.
(dissenting). I fully concur in the majority’s excellent exposition of why the trial court erred in failing to provide an adverse inference jury instruction. However, I cannot agree that the error was harmless. I therefore would reverse and remit for a new trial.
As explained by the majority, defendant diligently requested from the People a copy of the nightclub’s video footage, which was “reasonably likely to be of material importance” (People v Handy, 20 NY3d 663, 665 [2013]). Defendant was, therefore, entitled to an adverse inference charge, and the charge was *534 “mandatory upon request” (People v Blake, 24 NY3d 78, 82 [2014]). As the majority holds, defendant should have received the requested charge, and the trial court’s failure to do so amounted to error.[1]
I do not agree with the majority, however, that the error was harmless. In situations where evidence of guilt is overwhelming, “an error is prejudicial [to the defendant] ... if the appellate court concludes that there is a significant probability, rather than only a rational possibility, in the particular case that the jury would have acquitted the defendant had it not been for the error or errors which occurred” (People v Crimmins, 36 NY2d 230, 242 [1975]). However, “unless the proof of the defendant’s guilt, without reference to the error, is overwhelming, there is no occasion for consideration of any doctrine of harmless error” (id. at 241). “ ‘[Overwhelming proof of guilt’ cannot be defined with mathematical precision” and “does not invite merely a numerical comparison of witnesses or of pages of testimony” (id.). Instead, “the nature and the inherent probative worth of the evidence must be appraised. As with the standard, ‘beyond a reasonable doubt’, [the] recourse must ultimately be to a level of convincement” (id.). Thus, to be overwhelming,
“the quantum and nature of proof, excising the error, [must be] so logically compelling and therefore forceful in the particular case as to lead the appellate court to the conclusion that a jury composed of honest, well-intentioned, and reasonable men and *535 women on consideration of such evidence would almost certainly have convicted the defendant” (id. at 241-242 [internal quotation marks omitted]).
Here, the majority’s recitation of the facts paints an incomplete picture, and effectively substitutes this Court for the trier of fact. Although the evidence would support a jury verdict of guilt, it was not overwhelming.
Much of the People’s proof came from two eyewitnesses— Xavier White, a patron at the nightclub where the shooting took place, and David Herbert, the club’s bouncer — who both testified that they had viewed the gunman only for a few seconds, at most. Defendant was a stranger to both of them. The shooting occurred at nighttime, and the shooter was across the street from the entrance to the bar. Mr. White asserted that, when the gunshots began, he was facing the front of the bar, turned around, saw the shooter for “split seconds,” and then ran back inside the bar. Notably, Mr. Herbert admitted, on cross-examination, that he could not know for sure who the shooter was because he “did not see his face completely” and “didn’t see across the street.”
Messrs. White and Herbert based their identification of the gunman on their interactions with defendant earlier that evening. However, according to their testimony, neither witness had seen defendant prior to that night and both witnesses had only fleeting encounters with defendant earlier in the evening. Further, both witnesses acknowledged that defendant and his brother, Stephen, who had a verbal altercation with Mr. Herbert earlier that evening, looked very much alike. Mr. White testified that defendant and Stephen “looked like twins” and “[t]he only difference [between them] was one being taller and the other being shorter.” Mr. Herbert, when presented with two photo arrays the morning after the shooting, identified defendant as the shooter from one array, but identified a different brother of defendant’s, who was in prison at the time of the shooting, as the individual involved in the earlier altercation from the other array. From the testimony of the two eyewitnesses, a fair conclusion would be that someone with a familial resemblance to defendant was the shooter, but both eyewitnesses demonstrated an inability to distinguish one brother from the other(s).
Those eyewitnesses also offered inconsistent testimony as to the events leading up to the shooting, and provided different descriptions of what defendant wore and the car he drove that *536 night. Mr. Herbert testified that defendant arrived with two other people in a “dark black” or “dark blue” Honda, whereas Mr. White testified that only defendant and a woman exited a “dark green” Honda; he believed no one else was in the car. Mr. White testified that defendant had on a dark blue shirt with a navy stripe, but could not recall if it was a polo or button-down shirt. Mr. Herbert, on the other hand, described defendant as wearing a “blue sweater.” Mr. Herbert stated that he had a conversation with defendant that lasted “probably [a] couple of seconds” and then defendant went to speak with his brother Stephen, who was across the street. According to Mr. Herbert, after defendant came back over to the nightclub, a crowd began to form as he and defendant argued, and then defendant left. Mr. White testified differently: that defendant said he would return.
Robert Garcia, who was with defendant the night of the shooting, also testified at the trial. Robert Garcia stated that he, defendant, and defendant’s girlfriend had been at another club earlier that night. He said that defendant had been frisked prior to entering that club and, upon leaving, police officers stopped him and defendant at a checkpoint around the corner; the officers checked the car and let them proceed. He further testified that he, defendant, and defendant’s girlfriend all arrived at the nightclub in defendant’s car, they stayed there “less than five minutes” in total, and then left with Stephen and Stephen’s friend. Robert Garcia stated that defendant dropped off Stephen and Stephen’s friend approximately three blocks from the nightclub, and then defendant dropped Robert Garcia off approximately 10 blocks from there.
The People also called a cooperating witness, Jesse Garcia, a childhood friend of defendant, who testified that defendant had confessed to returning to the club and shooting a gun. However, Jesse Garcia admitted that, although he met with the police more than once prior to his arrest for an unrelated crime, he did not mention defendant’s confession. Only after Jesse Garcia’s arrest did he disclose defendant’s purported confession, and he then obtained a reduced sentence in exchange for his cooperation.[2] Jesse Garcia’s teary, choking delivery of his testimony against defendant, though consistent with truthfully providing testimony to send his friend to prison, is equally con *537 sistent with the guilt accompanying false testimony against his friend offered to reduce his own prison time. Jesse Garcia conceded that he did not know whether defendant actually committed the crime, and further testified that Stephen and defendant looked alike, so it was possible that they could be mistaken for one another at a distance.
Given the standard of proof beyond a reasonable doubt, the totality of the evidence in this case would support a verdict of either guilt or innocence. The evidence established that defendant and his look-alike brother were in the vicinity of the crime; defendant had just been searched at a different club and then by the police, who found no weapon; and defendant’s brother had more of an altercation at the club than did defendant. The majority cites the eyewitness accounts and defendant’s statements made to Jesse Garcia in support of its conclusion that the evidence in this case was overwhelming (see majority op at 533). However, “mistaken eyewitness identifications play a significant role in many wrongful convictions” (People v Santiago, 17 NY3d 661, 669 [2011]; see also People v Marshall, 26 NY3d 495, 502 [2015] [“Wrongful convictions based on mistaken eyewitness identifications pose a serious danger to defendants and the integrity of our justice system”]). Here, the eyewitnesses essentially conceded that defendant and his brother could be mistaken for one another. Further, neither could conclusively say that defendant actually committed the crime — Mr. Herbert did not see the shooter’s face, and Mr. White, who testified that he saw the gunman’s face in the dark from across the street, did so for only “split seconds” before running away into the bar under stressful and chaotic circumstances including gunfire. As to Jesse Garcia, he raised his account of defendant’s confession with the police only after he had been arrested and was facing up to 15 years in prison. A jury could plausibly credit or discredit any of this testimony.
That the shooting occurred 20 minutes after defendant and his brother had left the nightclub lends just as much support, if not more, to the defense’s theory that someone else committed the shooting — namely, Stephen. Defendant dropped off Stephen and Stephen’s friend only three blocks from the nightclub and then drove 10 more blocks to drop off Robert. Additionally, just prior to the shooting, someone yelled “they’re back” — not “he’s back.” Thus, it is just as plausible that Stephen and his friend — who were just a few blocks away — returned to the nightclub, and not defendant.
*538 Where, as here, evidence, even if substantial, is not overwhelming, that ends the harmless error inquiry, and defendant is entitled to a new trial. To act otherwise is to usurp the jury’s role as trier of fact. The question is not whether we think that giving the requested instruction would have changed the outcome: that question is for the jury to determine on retrial, weighing it along with the evidence and other instructions. I therefore respectfully dissent.
Chief Judge DiFiore and Judges Rivera and Fahey concur; Judge Wilson dissents in an opinion in which Judge Stein concurs.
Order affirmed.

. Further, the fact that the trial court allowed defense counsel on cross-examination and later on summation to argue about the absence of the videotape was not an adequate remedy for the court’s failure to give the adverse inference charge. “[A] trial counsel’s appeal to the jury during summation is not ordinarily a substitute for the appropriate jury charge by the court” (DeVito v Feliciano, 22 NY3d 159, 167 [2013]). Indeed, jurors are •routinely admonished that “arguments of counsel made during the course of trial are not evidence and must not be considered by you as such” (1 CJI[NY] 5.13 [Arguments of Counsel]), whereas the court “[is] responsible for explaining the law, not the lawyers .... [Y]our sworn duty as jurors is to follow [the court’s] instructions on the law” (CJI2d[NY] Model Instructions, Final Instructions: Pre-Summation Instructions, available at http:// www.nycourts.gov/judges/cji/5-SampleCharges/CJI2d.Final_Instructions.pdf [accessed May 18, 2017]; see e.g. People v Williams, 29 NY3d 84 [2017]; United States v Kennedy, 234 F3d 1263 [2d Cir 2000]). Thus, we have long recognized that “ ‘[t]he court’s charge is of supreme importance to the accused’” (People v Owens, 69 NY2d 585, 589 [1987], quoting People v Odell, 230 NY 481, 487 [1921]).

. Although he was facing 5V2 to 15 years in prison, Jesse Garcia pleaded guilty in exchange for a reduced prison sentence of IV2 to 3 years.